UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| PREZERV TECHNOLOGIES, INC.,<br><br>            Plaintiff,<br><br>        v.<br><br>ALESSANDRO MORARI, GIACOMO DOMENICONI, BARTOLOMEO GAROFALO, and SOLIDIUM AI, INC.,<br><br>            Defendants. | Case No. 1:21-cv-11918-FDS |

## FIRST AMENDED VERIFIED COMPLAINT & JURY DEMAND[1]

When startup company Prezerv Technologies, Inc. ("Prezerv") hired Defendants Alessandro Morari, Giacomo Domeniconi, and Bartolomeo Garofalo to assist with the development of its innovative and potentially valuable business idea, Prezerv thought it was aligning itself with talented engineers who would contribute to the growth of a promising early-stage business venture.

Instead, Defendants engaged in a malicious, extended, methodical, digital theft of Prezerv's confidential information and trade secrets—and attempted cover-up of the same.  As detailed herein, Defendants not only stole copies of Prezerv's proprietary data, code, and business plans; not only destroyed copies of the same that remained with Prezerv; not only attempted to spoliate evidence of their misdeeds; but misappropriated Prezerv's confidential information for their own benefit by doing little more than replacing Prezerv's name on documents with their own.

---

[1] Prezerv submits its First Amended Complaint as per its right pursuant to Fed. R. Civ. P. 15(a)(1)(B), which permits the amendment of a complaint as a matter of course within 21 days of the submission of a motion under Fed. R. Civ. P. 12(b), (e), or (f).

Defendants' actions breach multiple agreements between the parties, state and federal statutes, and the common law.  Immediate and thorough relief is necessary to make Prezerv whole.

## PARTIES

1.      Plaintiff Prezerv Technologies, Inc. ("Prezerv") is a startup company developing a software platform to enable the automatic management of civil infrastructure. The Prezerv platform will provide accurate 3D maps and data analytics of underground infrastructure such as utilities and valuable information about the in-situ condition of other infrastructure such as roads, tunnels, railways, and bridges. Prezerv intends to sell its products and services to a wide range of customers such as municipalities, infrastructure agencies, construction contractors, engineering firms and utility companies. Prezerv's software platform uses an innovative combination of machine learning, cloud computing, ground penetrating radar ("GPR") and other complementary non-destructive testing technologies.  Prezerv's principal place of business is located in Somerville, Middlesex County, Massachusetts.  At all times complained of herein, Prezerv was engaged in the conduct of trade or commerce and acting in a business context.

2.      Defendant Alessandro Morari ("Morari") is an individual, on information and belief, currently residing in Westchester County, New York.  During some of the times complained of herein, Morari resided in Katonah, Westchester County, New York; Everett, Middlesex County, Massachusetts; Medford, Middlesex County, Massachusetts; and Chelsea, Suffolk County, Massachusetts.

3.      Defendant Giacomo Domeniconi ("Domeniconi") is an individual residing in White Plains, Westchester County, New York.

4.      Defendant Bartolomeo Garofalo ("Garofalo") is an individual residing in Dawsmere Close, Camberley, United Kingdom.

5.      Defendant Solidium.AI, Inc. ("Solidium") is a Delaware corporation whose core team consists of Morari, Domeniconi, and Garofalo.  On information and belief, Solidium's principal place of business is the same as its CEO, Morari: Westchester County, New York.  At all times

herein, Solidium was engaged in the conduct of trade or commerce and acting in a business context.

<strong>JURSIDICTION AND VENUE</strong>

6.    This Court has subject matter jurisdiction pursuant to G.L. c. 212 §§ 3 and 4, as the amount in controversy exceeds $50,000, exclusive of interests and costs.

7.    This Court has personal jurisdiction pursuant to G.L. c. 223A § 3, as Defendants have transacted the relevant business in the Commonwealth, were contracted to supply services within the Commonwealth, and caused tortious injury within the Commonwealth.  Further, Defendants Morari, Domeniconi, and Garofalo have all agreed and submitted to this Court's jurisdiction for the purposes of the claims brought herein.

8.    Venue is proper in Suffolk County pursuant to G.L. c. 223 § 8 as Prezerv is a corporation that may sue or be sued in Suffolk.  Venue is further proper in Suffolk County as Defendants Morari, Domeniconi, and Garofalo have all agreed and submitted to the jurisdiction of the Business Litigation Session of the Suffolk Superior Court for the purposes of the claims brought herein.

<strong>STATEMENT OF FACTS</strong>

**I.    <u>Raufi's Entrepreneurial Insights in Founding Prezerv</u>**

9.    Prezerv's founder, CEO, and President is Cambiz "Cam" Raufi.  ("Raufi.")  Raufi is an entrepreneur who holds Bachelor's, Master's and PhD degrees in civil engineering and a Master's degree in business administration.  In addition to his extensive education, Raufi has worked on major infrastructure, engineering, and construction projects for international corporations such as Bechtel and local utilities including the MBTA, all of which has provided him significant experience with design, construction, and maintenance of civil infrastructure.

10.    Raufi identified several problems plaguing the civil infrastructure industry.  First, the data used by contractors and engineers was collected and managed on a small scale.  Second, many of

3

their processes were manual and slow with long turnaround times.  Third, there was a lack of accurate, readily accessible sub-surface data.  For example, engineers involved in underground infrastructure projects all too often had to gather historical data and piece together incomplete, out-of-date maps to try and identify the location of utility lines, sewers, pipes, or other obstructions before digging into the earth.  The absence of accurate and affordable maps of underground infrastructure often results in damages to underground utilities and subsequent public service disruptions, construction project delays, road closures, environmental harms, business income loss, and fatal and other injuries.  Ground penetrating radar ("GPR") technology was sometimes used for mapping, but it was limited because it relied on human interpretation, was expensive and was not offered on a large scale.  Raufi also recognized that these three problems created similar negative consequences for the ongoing assessment and maintenance of other infrastructure such as roads, tunnels, railways, and bridges.

11.     In early 2018, Raufi began formulating his technical ideas for solving these problems, conducted some preliminary technical and market research, and started planning a business to capitalize on the idea.  In March 2019, he registered the domain name "Prezervtech.com".  He would ultimately name the company Prezerv Technologies, Inc.  Later in 2019 and early 2020, Raufi's ideas crystallized with his insight to solve these infrastructure problems by combining machine learning, cloud computing, GPR and other complementary technologies such as light detection and ranging ("Lidar") and high-definition imaging, in one easily accessible, low-cost platform.

12.     At the center of Raufi's idea was an algorithm that would automate the process of collecting, parsing, and piecing data together to provide construction contractors and engineers with a reliable map of every underground obstacle they needed to be wary of, and do so on-

demand, with no delays, and with regular updates.  In addition to solving the underground

infrastructure problem for construction and engineering projects, the platform could be used to

assess the health of other infrastructure such as the condition of roads, tunnels, railways, and

bridges.

13.     Based on his engineering experience, Raufi understood that Prezerv's services would

have world-wide application. Municipalities; infrastructure agencies; private and public utility,

energy, construction, and transportation companies; engineering firms; in the U.S. and abroad—

all represent potential customers that could benefit from Prezerv's technology.  Raufi's early

market research indicated that Prezerv's potential addressable market size exceeded $200 billion

and was growing.

14.     Recognizing Prezerv's potential, Raufi began investing significant time and money into

his ideas.  By way of estimate only, Raufi spent over 5,000 hours since 2018 developing Prezerv,

its confidential information, and its trade secrets.

## II.     Prezerv Hires Morari, Domeniconi, and Garofalo, All Who Sign Confidentiality Agreements Protecting Prezerv's Confidential Information and Trade Secrets

15.     After identifying the customer problem, the potential customers for a technical solution

based on Raufi's idea and the market size, Raufi needed to hire technical expertise to help him

develop Prezerv's technology, products, and services.

16.     In July 2020, Raufi was introduced to Morari, who was an engineer at IBM Corporation.

Raufi discussed his business idea with Morari. Morari had machine learning experience but no

experience with civil infrastructure, GPR or other similar technologies.  Morari thought Raufi's

idea was "brilliant" and they began a months-long discussion about how they might work

together.  In the fall of 2020, Morari began some part-time technical work for Prezerv.  Raufi and

Morari decided to officially form Prezerv in January 2021 and on January 4, 2021 Raufi

incorporated Prezerv as a Delaware corporation by filing Prezerv's Certificate of Incorporation

with the Delaware Division of Corporations. Raufi was Prezerv's Chief Executive Officer

("CEO") and President; Morari was Prezerv's Chief Technology Officer ("CTO"). Raufi and

Morari were the two members of Prezerv's Board of Directors. Raufi was the majority

shareholder.

17.    In December 2020, Morari introduced Raufi to Domeniconi, who was a colleague of

Morari's at IBM and suggested to Raufi that Domeniconi had machine learning experience and

would be a good addition to Prezerv. Prezerv would eventually hire Domeniconi as an employee

on a part-time basis to be Prezerv's Director of Artificial Intelligence. Unlike Morari's CTO

position, Domeniconi's position was not an officer-level position at Prezerv.

18.    On or as of January 4, 2021, Morari and Domeniconi entered into multiple agreements

with Prezerv. First, and perhaps most importantly, were "Agreement(s) Regarding Assignment

of Inventions, Confidentiality and Non-Solicitation." (Exs. 1 & 2, the "Confidentiality

Agreements.") (Raufi also signed a similar Confidentiality Agreement with Prezerv on January

4, 2021.) Prezerv required Morari and Domeniconi to execute these Confidentiality Agreements

for a variety of reasons, one being that the Confidentiality Agreements were a customary and

reasonable measure taken to protect Prezerv's confidential information and trade secrets. These

Confidentiality Agreements contained multiple provisions that, by way of Defendants' actions,

are now at issue. These include terms:

> a.  Prohibiting the use or disclosure of any of Prezerv's confidential information
>
>     without prior written consent (§1);
>
> b.  Requiring the return of any of Prezerv's property in their possession (including
>
>     documents, devices, data, correspondence, and software) "immediately upon

termination" and prohibiting Defendants from retaining any property or copies thereof after termination (§2);

    c.   Stating that all inventions and useful ideas Defendants conceive or develop during their relationship with Prezerv that relate to Prezerv's business or Prezerv's products or services, result from their duties at Prezerv or result from their use of Prezerv's proprietary information, premises or property will be the sole property of Prezerv (§3);

    d.   Prohibiting solicitation or hiring of any person away from Prezerv (§6.1);

    e.   Prohibiting the solicitation of Prezerv's customers in any way or otherwise adversely modify Prezerv's relationships with those customers (§6.1);

    f.   Acknowledging the need for injunctive relief in the event of any breach of the Confidentiality Agreements (§8.1);

    g.   Establishing the right of Prezerv to recover all costs incurred, including attorneys' fees, from having to enforce the terms of the Confidentiality Agreements (§8.1);

    h.   Agreeing to the application of Massachusetts law for actions concerning the Confidentiality Agreements (§8.8); and

    i.   Consenting to the jurisdiction of the Suffolk Superior Court Business Litigation Session for all related disputes (§8.8).

19.    On January 4, 2021, Morari also entered into a Restricted Stock Grant Agreement with Prezerv. (Ex. 3, the "Stock Agreement.") The Stock Agreement granted shares of Prezerv stock to Morari, subject to a vesting schedule under which Morari would forfeit a portion of the shares upon Morari's termination from Prezerv if the termination occurred before September 1, 2024. (§2(a).) The vesting schedule provided that a portion of the shares would "vest" and no longer

be subject to this type of forfeiture each month until September 1, 2024. However, if Morari engaged in any misconduct—before or after his termination—all of the shares he held would be automatically forfeited and revert to Prezerv as Restricted Shares. (§2(f).) "Misconduct" was defined as, among other things, the unauthorized use or disclosure of Prezerv's confidential information or trade secrets. (§18(f).) The Stock Agreement also acknowledged Prezerv's potential need for injunctive relief (§14) and selected Massachusetts law to govern its terms (§13).

20.    On February 5, 2021, Domeniconi entered into a Stock Option Agreement with Prezerv. The Stock Option Agreement granted Domeniconi the right to purchase a number of shares of Prezerv stock, starting on January 1, 2022 only if he were still employed on that date. The Stock Option Agreement was offered upon the consent of Prezerv's Board, which included Morari at the time, and Morari joined in that consent. The Stock Option Agreement was issued with the purpose of serving as compensation for Domeniconi's expected work with Prezerv.

21.    Morari's Stock Agreement, Domeniconi's Stock Option Agreement, their positions with Prezerv (Morari as a Board member and CTO, Domeniconi as Director of Artificial Intelligence), and access to Prezerv's confidential information and trade secrets were all provided as consideration for the Confidentiality Agreements.

22.    In May 2021, Prezerv was introduced to Garofalo who had experience with GPR and other technologies that Morari and Domeniconi lacked. On May 11, 2021, Prezerv engaged Garofalo as a consultant to interpret and analyze the GPR data that Prezerv had collected. In doing so, Garofalo signed a Confidentiality Agreement similar to those signed by Morari and Domeniconi and including the same pertinent terms. (Ex. 4.)

23.     Prezerv purchased and issued Lenovo laptops to Morari and Domeniconi for them to use for their Prezerv work.  Prezerv also purchased and provided to Morari two external computer hard drives for him to use for his Prezerv work.  Morari and Domeniconi stored some of their Prezerv work on the Prezerv laptops.  They also used these laptops to access some of their Prezerv work in Prezerv's shared workspaces such as "cloud" environments including Google Cloud.  Prezerv did not issue a laptop to Garofalo.  He used his own computer to perform his Prezerv work and access Prezerv's shared cloud workspaces.

24.     During the winter and spring of 2021, Morari and Domeniconi repeatedly met with Raufi in Massachusetts as they worked to develop Prezerv.  In or about late January, Morari rented an apartment in Medford, Massachusetts for the purpose of working with and collaborating with Raufi in person in Somerville, Massachusetts.  Morari then rented another apartment, this time in Chelsea, Massachusetts, throughout February and March for the same purpose.  In March 2021, Domeniconi visited Boston to participate in approximately a week's worth of meetings and workshops in Massachusetts in which Raufi defined priorities for both Domeniconi and Morari, and taught them civil engineering principles and about utilities, and provided other background information necessary for their work with Prezerv. Morari then rented a more permanent residence in an apartment in Everett, Massachusetts, where he lived from April until the end of July, all while working at Prezerv.  In early April, Raufi assisted Morari with moving furniture out of storage in New Jersey and into this Everett apartment, where Morari appeared to be making a new home.

25.     In about June 2021, Morari informed Raufi that Domeniconi had been using IBM's research cloud servers for some of his Prezerv work. Shortly thereafter, Raufi directed Domeniconi to stop using IBM's servers for his Prezerv work.

26.     Morari's and Domeniconi's principal responsibility at Prezerv was to develop Prezerv's machine learning algorithm and software for the management of its database. Garofalo's principal responsibility was to manage the annotation process for identifying and cataloging its data, including training a team of annotators engaged by Prezerv and to provide quality control. Raufi intended to hire additional technical experts for various other technical components of Prezerv's business, such as user interface and website design.

27.     During the course of their work for Prezerv, Defendants Morari, Domeniconi and Garofalo used a number of third-party software development platforms and tools, including Google Cloud for the platform infrastructure, the GitHub online software platform to manage the development of Prezerv's software code, the Monday.com visualization and project management tool and the Dagster workflow management tools.  As described above, Morari and Domeniconi accessed these platforms and tools with Prezerv-issued laptops and Garofalo accessed these platforms and tools with his own computer.

### III.   Prezerv Invests Significant Resources Into Developing Its Technology and Business

28.     From January through July 2021, Prezerv invested significant time and resources into developing its technology and business. Raufi focused primarily on business and financing strategy, planning and development and guiding Defendants on their technical work.

29.     In January 2021, Prezerv incurred and paid fees and expenses to its outside legal counsel for legal work performed in connection with the incorporation and organization of Prezerv.

30.     In late February and March 2021, Prezerv used considerable funds to rent commercial scanning equipment to scan the streets and subsurface of Cambridge, Massachusetts and neighboring areas to accumulate over 800 miles of GPR data.  Raufi and Morari planned and performed the scanning work.  This data was to be processed and annotated by Garofalo and

used to train the machine learning algorithm being developed by Morari and Domeniconi at the core of Prezerv's software platform.

31.     In April 2021, Prezerv applied to the National Institute for Standards and Technology ("NIST") for grant funding in a proposal entitled "Data Platform for Improving Resiliency and Automated Management of Transportation Infrastructure." The contents of Prezerv's application were confidential.

32.     In July 2021, Prezerv applied to the National Science Foundation ("NSF")'s Small Business Innovation Research (SBIR) Program for grant funding to accelerate the development of Prezerv's prototype platform. The contents of Prezerv's application were confidential.

33.     In or about September 2020, after Raufi described to Morari his plans for the business that would be formally incorporated as Prezerv on January 4, 2021, Morari made a connection with Autostrade Tech S.p.A, a venture capital division of Autostrade per l'Italia, one of Europe's leading concessionaries for the construction and management of toll motorways.  Autostrade was interested in Raufi's solution.  Under Raufi's supervision, Morari began technical discussions with Autostrade's technical team.  Starting in February 2021, Prezerv and Autostrade worked on technical proposals, including Prezerv conducting research and development work that the two companies hoped would ultimately lead to a pilot project in which Prezerv would test its technology and Autostrade would make a financial investment.  In about May 2021, Prezerv's and Autostrade's negotiations shifted to include more business terms.  Prezerv engaged legal counsel in Rome, Italy to represent its interests in the negotiations with Autostrade.  On July 7, 2021, Prezerv and Autostrade signed a Non-Disclosure Agreement to advance the negotiations.

34.      In March 2021, Prezerv applied to participate in the MassChallenge startup accelerator program. Prezerv was accepted into the program and Raufi actively participated in the program

from June through early October 2021.  In this program, Raufi was provided mentorship and advice on Prezerv's business and developed valuable contacts.

35.    From February through October 2021, Raufi spent considerable time and effort discussing Prezerv's business with potential investors, business partners and prospective customers.

36.    In February and March 2021, Prezerv began to consider Prezerv ideas that could possibly be patented with the U.S. Patent and Trademark Office ("USPTO").  In March and April 2021, Prezerv prepared internal drafts of materials with these ideas and hired an outside patent counsel. During June and July 2021, the patent counsel used the materials Prezerv had prepared to prepare an official patent application.  Prezerv's patent counsel filed a provisional patent application with the USPTO in early August 2021.  Prezerv incurred and paid fees and expenses to the patent counsel.

## IV.    Prezerv Terminates Defendants, and Defendants Steal Prezerv's Trade Secrets

37.    On or about July 16, 2021, Raufi explained on a video conference call to Morari and Domeniconi that Raufi was not satisfied with their progress on developing Prezerv's prototype product. Raufi reminded them that Prezerv's business plan contemplated that Prezerv would complete the prototype product before seeking funds from outside investors.  Morari insisted that Prezerv should not wait to raise funds, but should instead proceed with fundraising by misleading potential investors as to the status of the prototype. Raufi was troubled by and firmly rejected Morari's plan.

38.    On or about July 19, 2021, Raufi and Morari had a telephone conversation in which Raufi expressed his concerns and issues with Morari's performance at Prezerv and with their July 16 discussion. Raufi informed Morari that their relationship at Prezerv was not working out.

39.     Shortly thereafter, Morari and Domeniconi began stealing Prezerv's trade secrets and confidential information.  Further, Morari and Domeniconi went to significant lengths to not only try to hide the tracks of their misappropriation but also to destroy much of Prezerv's proprietary data.  However, with the assistance of digital forensics, Defendants instead laid a trail of digital breadcrumbs leading directly towards their malfeasance.  Many of the facts that follow come from early forensic analysis of various devices and data and are supported by the affidavit of digital forensics expert Mark Spencer.  (Ex. 5 ("Spencer Aff.").)

40.     On July 20, 2021, Raufi informed Morari in person that he intended to terminate him from Prezerv.

41.     By July 21, 2021, Defendants were working to steal or otherwise destroy Prezerv's trade secrets.  As detailed below, Domeniconi was searching Google on this day for "github remove old commits permanently."  (Spencer Aff. ¶ 13 and cited exhibit.)  GitHub is an online software development platform Prezerv was using to build its proprietary and confidential software code. A "commit" is an individual revision or change to code on GitHub.  Consequently, if one was to "remove old commits permanently," one would be destroying all history of a code's development, including all iterations of the code.

42.     Prezerv used GitHub to develop and store the code for its machine learning algorithm and the code for its GPR annotation platform. These are core components of Prezerv's technology and valuable intellectual property. If stolen or destroyed, it would disrupt and significantly damage and jeopardize Prezerv's business.

43.     Unbeknownst to Prezerv at the time, Defendants were uploading Prezerv's confidential information and trade secrets to their own personal drives, storage devices, and online accounts. (See Spencer Aff. ¶ 22.)  Forensic analysis shows that Morari was uploading various files to his

personal Google Drive that, when retrieved and reviewed by Prezerv, were found to misappropriate Prezerv's own documents, data, and business plans.  (Discussed in further detail below.)

44.     The theft and destruction accelerated on July 22, 2021.  On that day Raufi terminated Morari's employment, informing Morari by phone around 1PM.  Shortly thereafter, Morari logged into Prezerv's Slack account.  Slack is an online workspace and collaboration tool, and was used by Prezerv to share confidential documents, centralize cross-functional product development, share funding opportunities, and coordinate the development of its code and other trade secrets.

45.     Around 1:50 PM on July 22, 2021, Morari deleted substantial portions of the communications and other data stored on Prezerv's Slack account, including all critical internal and external "direct message" communications and related attachments and critical portions of the "channels" (dedicated Slack workspaces organized by topics).  These deletions included a significant amount of valuable documents and communications concerning Prezerv's GPR data, software development, funding and investment opportunities, proposals and development with Autostrade, Prezerv's business and funding plans, and more.

46.     Minutes later, Morari changed the data retention settings on Prezerv's Slack account to retain data and changes for only one day.  This meant on a continuous basis, Slack would automatically and permanently delete Prezerv's Slack data more than 24 hours old. Consequently, by Morari's changing the data retention policy on July 22, all Prezerv's Slack data created on or before July 21 was irretrievably lost (unless Defendants retained a copy for their own misappropriation).  Morari's changing the data retention policy caused Slack to send an email alert to Raufi, who quickly signed into Slack and reset the preferences to try to limit any

automatic data loss.  Raufi's quick action, however, did not prevent and could not remedy Morari's actions.  As Raufi would learn from Slack customer service, Morari's multi-step deletions and changing the data retention settings made it impossible to retrieve any deleted data; and Morari had deleted data and many discussions related to business plans, Autostrade, and finances as well as technical files.  By doing so, Morari destroyed the work product that had taken significant time and effort to create, and which Prezerv would need to re-create to continue its plans, thereby materially setting back Prezerv's business prospects and growth.

47.    Around 2:29 PM on the same day, Morari logged into Prezerv's GitHub account and began destroying multiple repositories of Prezerv's software code.  One such repository contained the code that the Prezerv annotators were using to analyze and label the training data that Prezerv had spent weeks collecting from the streets of Cambridge.  The labeled data was to be used to develop Prezerv's proprietary machine learning algorithm.  This training data was critically important to Prezerv: without it, Prezerv could not continue to develop its algorithm and code.  Morari's destruction brought Prezerv's business to an immediate halt, and set Prezerv back months.  Since learning of the deletion, Raufi has diligently been working to retrieve or restore the annotation platform, but has been unable to undo Morari's destruction.

48.    Raufi took additional reasonable steps on July 22, 2021 to protect Prezerv's confidential information and trade secrets.  This included revoking Morari's and Domeniconi's access to their Prezerv Google accounts, to Prezerv's Google cloud platform and to Prezerv's Monday.com platform.  Unfortunately, these efforts would not be sufficient.  This was in part because Defendants had already stolen and destroyed much of Prezerv's data, and because Defendants would refuse to return their Prezerv-issued laptops for almost two months, in breach of their agreements with Prezerv.

15

49.     The next day, July 23, 2021, Raufi terminated Domeniconi's employment via WhatsApp (online communication service) and asked Domeniconi to return Prezerv's property.  Later in the day Raufi emailed both Morari and Domeniconi with formal written termination notices.  In doing so, Raufi demanded that Morari return all property belonging to Prezerv by the next day, and demanded Domeniconi do so by the following Tuesday.

50.     On July 22, 2021, Raufi informed Garofalo through an online Slack message that Raufi had terminated Morari's employment and requested a meeting with Garofalo.  On July 23, 2021, Raufi and Garofalo met online on Google Meet and Raufi informed Garofalo that he had terminated Morari's and Domeniconi's employment and that Prezerv's annotation platform was not working.  Raufi informed Garofalo that Raufi was attempting to restore the platform and work could resume as soon as that was done.  Raufi also told Garofalo that he would need some time to rebuild Prezerv's technical team.  Garofalo told Raufi that he was interested in continuing his consulting work for Prezerv.

51.     As described in more detail below, after deleting Prezerv's data, code and other valuable property from the GitHub and Slack platforms, Defendants turned their attention to Prezerv's Google cloud platform where Prezerv was also storing its critical data and code on various Google cloud servers. The data and code included raw, processed and annotated GPR data, metadata (inventory of GPR data), workflow management software code, virtual machine code enabling virtual workspaces for remote annotators, and activity logs. On July 28, 2021, Morari and Domeniconi used Dagster service accounts to hack into Prezerv's Google cloud platform despite the fact that Raufi had revoked their access to their Google accounts and the Google cloud platform on July 22, 2021. As with the data on GitHub, the data and code on the Google

cloud servers were all core components of Prezerv's development and valuable intellectual property, and Defendants, knowing that these were the only copies, deleted all of them.

### V.   Defendants Refuse to Return Prezerv's Property, Stalling While Their Misappropriation Continues

52.    As of July 30, 2021—one week after the termination notices were sent—Morari and Domeniconi still had yet to return Prezerv's devices, including laptops.  Raufi reminded Morari of this requirement via email.  On this same day, Raufi sent Morari a forfeiture notice pursuant to the Stock Agreement.  Through that notice, Raufi explained that due to Morari's termination, Morari had forfeited a number of shares of Prezerv stock.  Raufi also reminded Morari of his obligations under the Confidentiality Agreement, including the need to return all property belonging to Prezerv—including any code.

53.    On August 23, 2021, Raufi told Garofalo by email that Raufi was working on another component of the Prezerv platform and that Raufi would like to ask Garofalo a few questions about it. On August 24, 2021, Garofalo responded to Raufi by email that he is "currently working on a huge project and planning to go to Italy" and cannot find time to talk to Raufi. Raufi would come to learn that Garofalo's "huge project" was, in fact, Solidium.

54.    Almost a month after their terminations, neither Morari nor Domeniconi had returned any property to Prezerv.  Raufi once again reminded Domeniconi of the need to return everything belonging to Prezerv in his possession via a WhatsApp (online communication service) message on August 17, 2021.  Domeniconi did not immediately respond.

55.    Instead of responding to Raufi and/or returning Prezerv's property, Morari and Domeniconi were retaining legal counsel.  On August 24, 2021, Morari signed an engagement letter with Ellenoff Grossman & Schole LLP for the purpose of receiving "general corporate" and intellectual property advice.  The engagement was not for Morari and Domeniconi as

individuals, however, but for a company named "Solidium AI." As Prezerv would come to learn, Solidium was the company that Morari and Domeniconi had created and were using Prezerv's own confidential information and trade secrets to give an improper "head start."

56.    On August 27, 2021, Morari and Domeniconi finally responded by a letter. While the letter did not carry their new law firm's letterhead, it read as though prepared for them by their lawyer. But instead of returning Prezerv's property or even acknowledging their deletion of Prezerv's Slack data, Morari and Domeniconi demanded refund of $18,000.00 contributed to Prezerv, contested the calculation of shares that had vested to Morari, and represented that Prezerv's property would be returned sometime after September 3, 2021—itself one week away, and over a month since Morari's and Domeniconi's terminations.

57.    Prezerv replied on September 2, 2021. In a letter from its own outside counsel, Prezerv provided notice that Morari forfeited all his Prezerv shares pursuant to §2(f) of the Stock Agreement. Under that provision, any misconduct by Morari caused his forfeiture of all Prezerv stock—vested or otherwise. For proof of misconduct, Prezerv pointed to Morari's deletion of Prezerv's Slack data and failure to return Prezerv's property (including devices and data) despite repeated requests. (Prezerv was not yet aware of Morari's much more extensive theft and deletion of Prezerv property, including software code and data in Prezerv's Google cloud and GitHub repositories.)

58.    Prezerv's letter went on to notice potential claims against both Morari and Domeniconi and directed them to preserve all documents, data, and other things within their custody or control relating to such claims—including metadata. The letter also renewed Prezerv's demand that Morari and Domeniconi immediately return Prezerv's property.

59.    Finally, the letter requested Morari and Domeniconi sign a certification that they had abided by the terms of the Confidentiality Agreements, had returned all of Prezerv's property, that they did not retain any copies of Prezerv's data, that they would not engage in any conduct violating their obligations to Prezerv, and that they had not used or disclosed any of Prezerv's confidential information and trade secrets outside of Prezerv.  The proposed certification specifically identified any data housed on IBM servers.  As noted above, Morari had informed Raufi that Domeniconi was using IBM's research cloud servers for some of his Prezerv work. Despite Raufi's direction that Domeniconi stop using IBM's servers for Prezerv work, Prezerv is not certain if Domeniconi followed Raufi's direction.  Because Morari and Domeniconi were still full-time employees of IBM while they worked part-time for Prezerv, Prezerv had reason to suspect that they were using IBM resources including IBM servers for Prezerv work and to store Prezerv data.  Considering the importance of Prezerv's confidential information and trade secrets to its developing business, these were reasonable requests to make to ensure the protection of the same.

60.    A week later, on September 8, 2021, Morari's and Domeniconi's counsel responded. Their counsel did not deny or otherwise rebut the facts of Prezerv's letter, but instead requested copies of documents (e.g., the Stock Agreement and Confidentiality Agreements) already in Morari's and Domeniconi's possession.  Nor did this letter provide the signed certifications requested by Prezerv.  As such, this letter was little more than a blatant stall tactic.

61.    Wasting no time, Prezerv responded by email the following day, September 9, 2021, providing the requested documents and demanding—again—that Morari and Domeniconi immediately return Prezerv's property, as they had yet to return *any*.

62.     Morari's and Domeniconi's counsel replied by letter the next day, September 10, 2021, stating Morari and Domeniconi would return "their laptops and the computer code at issue" via Federal Express package being sent the next day and asserting that Defendants had no other property belonging to Prezerv in their possession.  No certifications signed by Morari and Domeniconi were provided confirming that this represented the entirety of Prezerv's property in their possession, that they had not violated and would not violate their obligations to Prezerv, or that they had not disclosed Prezerv's confidential information and trade secrets to anyone outside of Prezerv.

63.     Unbeknownst to Prezerv, Defendants were using this time—between the September 8, 2021 letter from their counsel and the ultimate return of the laptops on September 14, 2021—to continue their ongoing theft of Prezerv's confidential information and trade secrets, as well as their efforts to destroy all evidence of doing so.  This theft and cover-up efforts, and the forensic analysis required to uncover them, is detailed below.

64.     On or about September 14, 2021, Prezerv received the Federal Express package, which included two laptops, two hard drives, power chargers, and a letter dated September 13, 2021. The letter, signed by Morari and Domeniconi but not under the pains and penalties of perjury, stated that the laptops and drives "include all Prezerv Technologies' data and code in our possession" and that "there are no other copies of the code or the data outside the ones shipped." As Prezerv would soon learn, this was not true.

65.     Shortly after receiving the laptops and the hard drives, Prezerv provided them to a forensics expert for preservation and analysis.  At no time between receiving the laptops and drives and providing them to the forensics expert did Prezerv turn on, boot up, access, tamper with or otherwise take any action that could alter, manipulate, or corrupt any of the data on the

laptops or drives.  Instead, Prezerv took efforts to ensure that the forensics expert received the laptops and drives in the exact same state as they had been returned by Defendants.

66.     On October 4, 2021, Defendants formed a company named "Solidium AI, Inc." by filing a Certificate of Incorporation with the Delaware Division of Corporations.  (See Ex. 6.)

## VI.     **Expert Forensic Analysis Recovers Proof of Defendants' Trade Secret Theft**

### A.     **Defendants' Extensive Spoliation of Evidence**

67.     Initial analysis of Morari's and Domeniconi's laptops and drives suggested that both had been wiped clean of data—or that someone had at least tried to wipe them clean of data. Consequently, Prezerv needed to perform forensic analysis to comprehend the extent of Defendants' misdeeds and coverup of the same.  (See generally, Spencer Aff.)  That analysis returned a significant volume of suspicious activity.  (Spencer Aff. ¶ 7.)

68.     Forensics found that Defendants had begun online research how to destroy Prezerv's data and conceal the facts of the same as early as July 21, 2021.  (Spencer Aff. ¶ 12.)  On that day, Domeniconi's laptop was used to search for "github remove old commits permanently," the importance of which is explained above, and "Google cloud recovery deleted virtual machine," which suggests the Defendants were doing due diligence to ensure their deletion efforts were permanent.

69.     However, it was between September 8, 2021 (the date of the first letter from Defendants' counsel) and September 14, 2021 (the date the laptops were ultimately returned) that Defendants increased their efforts to purposefully spoliate evidence of their misappropriation:

> a.  On September 8, 2021, Morari's laptop was used to search for "how to remove all tracks of hacking."  (Spencer Aff. ¶ 12.)

> b.  On September 11, 2021, Defendants engaged in a significant amount of deletion activity.  (Spencer Aff. ¶ 11, 13.)  This included deleting the user profiles they

had used on the laptops for months, and creating new, sham user accounts in an attempt to destroy and/or hide all of their user activity on the laptops to date.  (See Spencer Aff. ¶ 11.)

c.  Data retrieved from the laptops further shows that Defendants were attaching and accessing data on external drives at this time.  (Spencer Aff. ¶ 16-34 and cited exhibits.)  For example, shortly before 2PM on September 11, 2021, a Western Digital Elements external drive was connected to Morari's laptop.  Starting twenty minutes later, Dagster-related data was being accessed on the external drive.  (Spencer Aff. ¶ 21 and cited exhibit.)  Dagster is a data orchestrator for machine learning, and was used by Prezerv to develop its algorithm.  Analysis identifies two external hard drives being used with Morari's laptop—the aforementioned Western Digital Elements and a "SMI USB DISK 1100." Defendants did not provide either of these hard drives to Prezerv, despite this evidence that strongly suggests them containing copies of Prezerv's confidential information and trade secrets.  (Spencer Aff. ¶ 17, 23.)

d.  Further, at 2:13PM on September 11, 2021, Defendants surgically deleted two specific code files: purge_project.py and purge_project.yaml.  (Spencer Aff. ¶ 15.)  These code files included language that could delete all of Prezerv's data pipeline across multiple repositories.  The presence of these code files is suspicious, and its surgical deletion prior to the general wipe conducted an hour later even more so, as it infers that Defendants knew this code could be a "smoking gun."  Analysis of this code and why it was present on the laptops is ongoing.

e.  Later on September 11, 2021, Defendants searched the internet for "eraser" then ran setup files for "Heidi Eraser."  (Spencer Aff. ¶ 10.)  Heidi Eraser is an advanced security tool that allows a user to completely remove sensitive data from a hard drive.  (Spencer Aff. ¶ 8.)  By running Heidi Eraser on the laptops,

Defendants caused permanent and significant damage to the metadata frequently used to identify data theft.  (Spencer Aff. ¶ 9.)  Despite Defendants' efforts to hide their tracks, Prezerv's forensic experts were largely able to recover proof of Defendants' misdeeds because Defendants failed to empty their "Recycle Bin" on Morari's laptop.  (Spencer Aff. ¶ 14.)  Shortcut analysis shows that Defendants ran Heidi Eraser not long after their use of the Western Digital Elements external hard drive discussed above.  (Spencer Aff. ¶ 18, 21 and cited exhibits.)

70.     Forensic analysis of Domeniconi's laptop provides further evidence of both the digital theft and efforts to cover up the same.  In late August, Domeniconi was accessing the GPR data Prezerv had worked hard to collect.  In early September, Domeniconi was also connecting external hard drives to the laptop—likely to export data for future use—and shortly thereafter accessed files related to Prezerv's trade secrets and efforts, including GPR data.  (See generally, Spencer Aff.)

71.     The cumulative effect of these facts demonstrates that Defendants were taking measures to transfer Prezerv's confidential information and trade secrets to repositories such as the above-mentioned external hard drives, then taking steps to destroy any trace of the data itself and their efforts to abscond with it from the laptops.

**B.      Defendants' Brazen Misappropriation of Prezerv's Confidential Information and Trade Secrets**

72.     In addition to the evidence of Defendants' attempts to cover their tracks and otherwise purposeful spoliation, the forensic experts were also able to retrieve many of the documents that had been kept on Morari's laptop and which Defendants had attempted to destroy.  These documents demonstrated how Defendants were working against Prezerv's interests and misappropriating Prezerv's confidential information and trade secrets to give their own company, Solidium, an improper head start.

73.     Many of the documents retrieved referenced "Solidium.AI" – the same company recently incorporated in Delaware.  One, titled "Milestones and Fundraising Plan," identified Morari as

Solidium's CEO, Domeniconi as CTO, and Garofalo as Head of Geophysics.  It also described Solidium's goal as the development of a platform using GPR, Lidar, and HD images to assess the health of civil infrastructure—just like Prezerv.  Many of the descriptions in the document described the platform and technologies being developed by Prezerv, including those Prezerv had been negotiating to develop with and provide to Autostrade, and others are clearly drawn from communications with Autostrade or various Prezerv grant applications.  It also referenced the collection of 800+ miles of GPR data—which was the data *Prezerv* spent time and money collecting from the streets of Massachusetts.  But perhaps most striking of all, the section of the document titled "Project Status" states that "The Project started in *November 2020"* (emphasis added) -- during the early stages of Morari's and Raufi's discussions about launching Prezerv.  The section goes on to list Solidium's discussions with Autostrade, the collection of GPR data and three additional technical milestones that "we" [Solidium] completed.  In fact, the technical milestones were (allegedly) completed while the Defendants were working for Prezerv.  The document's reference to "November 2020" could mean only one of two things:  The first is that, since those early discussions and the entire time he was working at Prezerv, Morari was simultaneously scheming to develop a competing business using Prezerv's trade secrets.  The second is that Morari and the other Defendants conspired to hatch this scheme some time later, but decided to date the beginning of their scheme back to Morari's early discussions with Raufi.  In either case, the Defendants' whitewashing of Prezerv's existence (and thereby defrauding prospective investors in Solidium who receive this Solidium fundraising document) and theft of Prezerv's trade secrets are violations of their Confidentiality Agreements, Morari's Stock Agreement, fiduciary duty, and good faith.

74.      Solidium's "own" pitch deck -- a document used to promote or "pitch" a company's business to prospective investors, business partners and customers -- also contains many elements taken directly from Prezerv's pitch deck.  Some pages contain identical text and similar graphics and layout as Prezerv's, the only changes being cosmetic (e.g., changing green background to blue).  Solidium's deck goes so far as to identify a project with Autostrade as a

key indicator of Solidium's "traction" in the market, using the exact same language used by Prezerv in its own deck.



**Fig. 1**

(Left: Slide from "SolidiumAI-pitchdeck."  Right: Slide from Prezerv's pitchdeck.)

75.     Another set of documents appear to be evolving drafts that Defendants were preparing for their own patent counsel for the purpose of preparing a patent application.  But these "Solidium" documents misappropriated information from Prezerv documents that Prezerv had marked and treated as confidential.  Specifically, these "Solidium" files, with titles including "SolidiumAI_patent_Bart," "Solidium-patents-all," and "SolidiumAI_patents-all," included language directly copy and pasted from Prezerv's internal documents referenced above describing ideas for potential patent applications Prezerv had submitted to Prezerv's patent counsel and from submissions to above-described MassChallenge, the NIST, and the NSF programs, all of which were labeled "confidential" material of Prezerv.  Some of these "Solidium" files even *included photographs of Raufi posing with scanning equipment used by Prezerv*, and directly referenced *Prezerv*.  For example, one such "Solidium" document states how "*Prezerv* invented…" and "The following picture depicts . . .  the *Prezerv* approach." (Emphasis added.)  Later drafts of these documents show "Prezerv" being replaced with "Solidium."  Further, the retrieved files show that many of these documents had been previously

saved with "Prezerv" in their file name, only to have the reference to Prezerv replaced with "Solidium,"—just as the company names were swapped in the in-document text.



**Fig. 2**

(Screenshot from "Solidium-patents-all."  Note language re: "Prezerv invented," "the Prezerv approach," and "Prezerv Technologies-CONFIDENTIAL."  Mr. Raufi is pictured in the photograph in the lower right.)



**Fig. 3**

(Screenshot from "SolidiumAI_patent."  Note how the graphics now reference Solidium—but still draw from Prezerv's pitchdeck—and how the text still directly references Prezerv.)

76.     This "cut-and-paste" theft of Prezerv's trade secrets more likely than not occurred between mid-July, when Raufi informed Morari of his imminent termination, and mid-September, when Prezerv's laptops were finally returned.  Forensic analysis of Morari's laptop demonstrates that, during that time, Morari was busy hacking into and accessing a variety of confidential documents.  For example, on August 4, 2021, Morari accessed Prezerv's pitch deck and, two days later, accessed a number of documents concerning the negotiations with Autostrade.  On August 14, 2021, Morari was drafting a document titled "TO-DO" that he kept in a folder titled "Solidium" and which included, among other things, a plan for pursuing both business from Autostrade and a variety of patents.  On August 25, 2021, Morari accessed documents concerning Prezerv's patent application.  (Spencer Aff. ¶ 18 and cited exhibit.)

77.     Data retrieved from Morari's laptop also shows that he had created a folder titled "Solidium."  The documents he kept in that folder included "**Prezerv**-MC-pitchdeck-v5logo.pptx," "**Prezerv**-MC-pitch.pptx," and "**Prezerv**-patents-all.doc."  (Emphasis added.)  Morari's "Solidium" folder was therefore full of Prezerv's confidential information and trade secrets.

**VII.    Defendants' Continued Attempts to Spoliate Evidence**

78.     On October 6, 2021, Raufi received further notice of Defendants' attempts to destroy Prezerv's data and hide their tracks of doing so.  On that day, Raufi received an email from GitHub warning him of an attempt by someone using Morari's credentials to access Prezerv's GitHub account.  The attempted hack was unsuccessful because the person trying to log in (most likely Morari) was using an unrecognized device.  This triggered a "Please Verify Your Device" email to be sent to Morari's email account at Prezerv, which was re-directed to Raufi.  Fearful that Morari was attempting to steal or destroy more of Prezerv's data, Raufi quickly signed into Prezerv's GitHub account and reset the password for Morari's account to ensure Morari would be locked out.

79.    It was at this time that Raufi became aware of Defendants' deletion of Prezerv's GitHub data.  Raufi first discovered that multiple repositories and the data kept therein were simply missing from the platform.  Raufi then reviewed the Security Log for Morari's GitHub account, which expressly showed that Morari had logged into GitHub in July 2021 and deleted multiple repositories.  Raufi attempted to recover the deleted data, but GitHub only allowed restoration of deleted repositories for 30 days after their deletion.  This meant that, due to Defendants' efforts to destroy Prezerv's data, this data was lost to Prezerv, unless Defendants retained a copy for their own misappropriation.



aleprezervtech – repo.destroy

Deleted the repository prezervtech/utilsim

38.13.9.31  |  Revere, Massachusetts, United States  |  on Jul 23

aleprezervtech – repo.destroy

Deleted the repository prezervtech/gpr_segmentation

38.13.9.31  |  Revere, Massachusetts, United States  |  on Jul 23

**Fig. 4**

(Excerpt from GitHub Security Log showing Morari's deletion of repositories.)

80.    On information and belief, Morari and Domeniconi continue to work with Garofalo to develop Solidium.  This is supported by the Solidium pitch deck and other materials retrieved from Morari's and Domeniconi's laptops that identify Garofalo as one of Solidium's team members.  This is despite the non-solicitation and other provisions present in the Confidentiality Agreements signed by all three of these Defendants.  Unlike Morari and Domeniconi who used Prezerv-issued laptops for their Prezerv work, Garofalo used his own computer for his Prezerv work.  Accordingly, Prezerv has not yet been able to perform a forensic audit on Garofalo's

28

computer to verify exactly what Prezerv trade secrets Garofalo copied and destroyed with his computer.

**VIII.    Continued Investigation by Prezerv Discovers Further Efforts by Defendants to Destroy Prezerv's Confidential Information and Trade Secrets**

81.    Being put on high alert by the results of the forensic analysis, Prezerv has conducted, and continues to conduct, investigation into the theft and destruction of its data by Defendants.  As more evidence is found, Prezerv worries that it has only scratched the surface and does not yet know the full extent—or repercussions—of Defendants' illegal actions.  Prezerv's recent discoveries are summarized below.

82.     There is no longer any record of Prezerv's work product or data on the Monday.com cloud platform.  Prezerv has contacted Monday.com's customer service in attempt to secure an activity log, but it appears that all of the actual work product on the site has been destroyed.

83.    Prezerv's work on Google's cloud platform was saved in a workflow titled "Platform." That workflow still exists in Raufi's account (albeit empty, the data having been deleted by Defendants), but no longer appears in Morari's or Domeniconi's Prezerv-issued accounts. Further, the activity logs for Morari's and Domeniconi's accounts have been wiped out, destroying evidence of what they did and when they did it.

84.    The audit log for Prezerv's Google cloud platform shows that Morari and Domeniconi used Dagster service accounts as a "back door" to hack into the Google cloud platform on July 28, 2021—subsequent to their terminations from Prezerv and six days after Prezerv had revoked their access to their Prezerv Google accounts and to the Google cloud platform.  When doing so, Morari and Domeniconi accessed data storage buckets, deleted computational disks, and deleted activity logs.  Morari additionally attempted to delete the audit log, which would have spoliated evidence of these other acts, but Google denied the request per its policy.

85.    Analysis of the disk usage data for Prezerv's Google cloud servers showed no data prior to September 17, 2021.  This strongly suggests deletion by Defendants, because Prezerv's annotators were busy annotating Prezerv's GPR data for months during that time period, which

should have been reflected in these reports.  Instead, the reports simply state "No data is available for the selected time frame[s]."

86.     All activity on Prezerv's "Postgres" server on the Google cloud platform has been erased.

87.     Additional reports strongly suggest that Defendants continued to try to hack into Prezerv's Google-hosted data, and even synchronize their devices with the repositories.  Prezerv has taken action, and continues to take action, to quash these attempts.

88.     Prezerv is continuing to analyze the external hard drives Defendants returned to Prezerv. The drives appear to contain some of Prezerv's workflow management software code, but they do not contain the critical elements of the code thereby rendering useless the returned code.

## IX.    Defendants Have Caused Considerable, Irreparable Harm to Prezerv

89.     Defendants have caused considerable harm to Prezerv, which will be irreparable if allowed to continue.  This includes but is not necessarily limited to the deletion of Prezerv's Slack data, GitHub data, Google cloud data, GPR data, and code; all of which constituted confidential information and trade secrets, all of which required significant effort and resources for Prezerv to develop, and all of which is essential to Prezerv's on-going development. Defendants' destruction of this data has caused and continues to cause months of delay and wasted resources.

90.     Further, by retaining and misappropriating Prezerv's data, code, business plans, patent application material, and other documents—all of which constitute confidential information and trade secrets—Defendants are giving themselves an improper head start to their own business.

91.     Additionally, there is the harm caused by the Defendants failure to their fiduciary duties and duties of good faith and fair dealing while employed by Prezerv when they simply failed to do the job they were hired to do.  Prezerv relied on Defendants to complete work that should have taken significantly less time than that used by Defendants.  This alone caused Prezerv to suffer months of delay and wasted resources.

92.     This has all caused a disruption of Prezerv's relationships with prospective customers, investors and business partners, and the usurpation of Prezerv's goodwill with prospective

customers, investors, and business partners.  It has caused or risked the disclosure of Prezerv's proprietary trade secrets.  Defendants' formation of Solidium and attempts to misappropriate Prezerv's trade secrets jeopardizes Prezerv's business opportunities and reputation.  All of this presents an economic loss which is unascertainable at this time and may never be ascertainable, as well as future economic loss which is also presently incalculable.

93.     Further, Defendants continue to use and attempt to profit from their misappropriation of Prezerv's confidential information and trade secrets.  First, data retrieved from Defendants' laptops demonstrates Defendant's intent to not only pursue investment and funding, but also to pursue a patent—all based upon Prezerv's confidential information and trade secrets.  Second, on information and belief, Defendants have already approached Y Combinator, a technology startup accelerator that has helped launch many prominent companies, and would likely have interest in funding Prezerv.  By misappropriating Prezerv's confidential information and trade secrets and using them to entice Y Combinator, Defendants are causing irreparable harm to Prezerv and diminishing any chance for it to do the same.

## X.     Defendants Refuse to Pay Costs Incurred By Prezerv and Further Breach the Confidentiality Agreements

94.     Prezerv filed its initial Verified Complaint in the Business Litigation Session of the Massachusetts Superior Court on November 9, 2021.  Contemporaneously with the Verified Complaint, Prezerv filed an Ex Parte Motion for a Temporary Restraining Order and Order to Preserve Evidence and separately a Motion for a Preliminary Injunction.  These motions, along with the Verified Complaint, were necessary for Prezerv to enforce the provisions of the Confidentiality Agreements and protect its confidential information and trade secrets.

95.     On or about November 10, 2021, the Massachusetts Superior Court granted the Ex Parte Motion for a Temporary Restraining Order and Order to Preserve Evidence.  Defendants then removed the matter to the United States District Court for the District of Massachusetts.  Once there, on December 7, 2021, the Court issued an order more expansive than the one issued by the

Massachusetts Superior Court, and restrained Defendants from conducting any business relying upon Prezerv's confidential information and/or trade secrets.  On that same date, the Court granted Prezerv's Motion for a Preliminary Injunction and issued a subsequent order regarding the same on December 15, 2021.

96.     On December 27, 2021, Prezerv sent letters to Defendants demanding reimbursement under §8.1 of the Confidentiality Agreements, which states in the pertinent part that Defendants Morari, Domeniconi, and Garofalo were required to pay "all costs incurred by [Prezerv] in enforcing the provisions of this Agreement, including reasonable attorneys' fees."  (Exs. 1, 2, & 4.)

97.     On December 28, 2021, Defendants Morari and Domeniconi rejected Prezerv's demand, refusing to pay the requested amounts.  As of the date below, Garofalo has not responded to Prezerv's demand, but Prezerv has reason to believe that Garofalo will either ignore if not reject this contractual duty.

98.     Prezerv has incurred substantial costs in enforcing the provisions of the Confidentiality Agreements.  And even though nothing in the Confidentiality Agreements requires "successful" enforcement, the multiple orders from both state and federal courts enjoying Defendants' actions demonstrate both Prezerv's success in and Prezerv's need to enforce the relevant terms. Defendants' refusal to abide by their contractual obligations and reimburse Prezerv the costs incurred in those efforts is therefore a further breach of the Confidentiality Agreements.

## COUNT I

### Misappropriation of Trade Secrets in Violation of MGL ch. 93 § 42 *et seq.*

### (All Defendants)

99.     The allegations of the preceding paragraphs are hereby incorporated by reference as though fully set forth herein at length.

100.    Massachusetts' trade secret law, revised effect in 2018, explicitly protects not only information that provides "actual" economic advantage, but also information that has "potential" economic advantage. In other words, a plaintiff does not need to prove that the protected trade

secret is currently in use, only that it has potential economic value.  Moreover, a plaintiff may now seek an injunction not only for "actual", but also for "threatened" misappropriation of trade secrets.

101.    Prezerv's data, business plans, code, and other trade secrets constitute "trade secrets" as defined under Mass. Gen. Laws Ann. ch. 93, § 42.

102.    Defendants' theft of Prezerv's trade secrets, unreasonable intrusion into Prezerv's various data repositories (including after their termination), and any attempt to reverse engineer code, data, business plans, or other materials for use by Solidium from Prezerv's trade secrets and confidential information constitute "improper means" as defined under Mass. Gen. Laws Ann. ch. 93, § 42.

103.    Defendants' acquisition of Prezerv's trade secrets and confidential information constitutes "misappropriation" as defined under Mass. Gen. Laws Ann. ch. 93, § 42.

104.    At the time of Defendants' misappropriation, Prezerv's trade secrets and confidential information provided economic advantage, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, others who might obtain economic advantage from its acquisition, disclosure, or use.

105.    At the time of Defendants' misappropriation, Prezerv's trade secrets and confidential information were the subject of efforts that were reasonable under the circumstances, which may include reasonable notice, to protect against it being acquired, disclosed, or used without the consent of the person properly asserting rights therein or such person's predecessor in interest.

106.    Defendants' misappropriation was and is a substantial factor directly and proximately causing damages and irreparable harm to Prezerv.  Prezerv continues to suffer irreparable harm due to Defendants' actions.  Prezerv is therefore entitled to injunctive relief as provided under Mass. Gen. Laws Ann. ch. 93, § 42A, prohibiting any use or potential use of Prezerv's trade secrets by Defendants.

107.    Prezerv is entitled to damages as provided under Mass. Gen. Laws Ann. ch. 93, § 42B, including damages related to the actual loss caused by Defendants' misappropriation and any

unjust enrichment to Defendants caused by their misappropriation.  Further, because Defendants' misappropriation was and continues to be willful and malicious, exemplary damages are warranted.

108.    Prezerv is entitled to attorneys' fees as provided under Mass. Gen. Laws Ann. ch. 93, § 42C, as Defendants' misappropriation was and continues to be willful and malicious.

**COUNT II**

**Misappropriation of Trade Secrets in Violation of the Defend Trade Secrets Act**

**(All Defendants)**

109.    The allegations of the preceding paragraphs are hereby incorporated by reference as though fully set forth herein at length.

110.    The Defend Trade Secrets Act ("DTSA") was passed into law on May 11, 2016, and amends chapter 90 of Title 18 of the U.S. Code. It forbids threatened and actual misappropriation of trade secrets "if the trade secret is related to a product or service used in, or intended for use in, interstate of foreign commerce."

111.    "Trade secrets" are broadly defined under the DTSA to include "all forms and types of financial, business, scientific, technical, economic or engineering information." As described above, certain confidential and proprietary information of Prezerv constitutes trade secrets related to a product or service used in, or intended for use in, interstate commerce, including but not limited to information regarding Prezerv's data, code, and business plans.

112.    Prezerv takes reasonable measures to protect the secrecy of such information.  These measures include password-protected databases, confidentiality and non-disclosure agreements, and limitations on dissemination of information on a need-to-know basis.

113.    Defendants Morari, Domeniconi, and Garofalo knew that they had a duty to maintain the secrecy of Prezerv's confidential information and trade secrets, in part, by signing their Confidentiality Agreements.

114.    The Confidentiality Agreements also specifically referenced the DTSA, and provided Defendants notice of the whistleblower immunity provided by the DTSA.

115.    On information and belief, as described above, all Defendants engaged in a scheme to misappropriate Prezerv's trade secrets.

116.    On information and belief, the Defendants have used Prezerv's confidential proprietary information and trade secrets for their benefit, or for the benefit of another party, without Prezerv's consent or authorization and in a manner that will cause irreparable harm to Prezerv.

117.    Defendants' actions constitute actual and continuing misappropriation in violation of the DTSA.

118.    Prezerv has suffered damages and irreparable harm as a result of Defendants' breaches of the DTSA.

119.    Prezerv is entitled to actual damages from Defendants and for attorneys' fees.

120.    Prezerv's damages cannot be adequately compensated through remedies at law alone, thereby requiring equitable relief in addition to compensatory relief.

121.    Defendants' actions will continue to cause irreparable harm and damages to Prezerv and its confidential and trade secret information if not restrained.

## COUNT III

### Misappropriation of Trade Secrets – CFAA

### (All Defendants)

122.    The allegations of the preceding paragraphs are hereby incorporated by reference as though fully set forth herein at length.

123.    Prezerv's laptops, GitHub platform, Slack platform, and Google cloud servers are all systems used in or affecting interstate commerce or communication and either used to access the internet or used through the internet.  Prezerv's laptops are "protected computers" within the meaning of the Computer Fraud and Abuse Act ("CFAA").

124.    On information and belief, Defendants violated the CFAA when they, knowingly and with intent, intentionally accessed Prezerv's laptops, GitHub platform, Slack platform, and Google cloud servers without authorization and/or in excess of their authorization, and after their

termination from Prezerv, including when they took, without authorization, Prezerv's valuable confidential and proprietary information and used it for their own benefit.

125.    Prezerv has suffered damages and/or loss by reason of Defendants' actions in violation of the CFAA.

126.    Pursuant to the CFAA, Prezerv is entitled to recover damages against Defendants.

127.    Prezerv seeks recover to the full extent permitted by the CFAA, including but not limited to loss aggregating at least $5,000 in value, including the cost of responding to and investigating the misappropriation of Prezerv's trade secrets and the destruction of Prezerv's data on its laptops, GitHub platform, Slack platform, and Google cloud servers and related costs.

128.    Pursuant to the CFAA, Prezerv is entitled to temporary and permanent injunctive relief enjoining Defendants from making any further use of Prezerv's valuable confidential and proprietary information and requiring the return of all documents and things containing of embodying such information.

## COUNT IV

### Misappropriation – Common Law

### (All Defendants)

129.    The allegations of the preceding paragraphs are hereby incorporated by reference as though fully set forth herein at length.

130.    Prezerv owns confidential and proprietary information as described herein.

131.    Defendants were provided with access to the confidential and proprietary information owned by Prezerv in the course of their employment and in the case of Garofalo, his consultancy. Defendants continued to improperly and without authorization access that confidential and proprietary information after their termination.

132.    Defendants were and are obligated to maintain the confidentiality of the confidential and proprietary information they received from or had access to in the course of their employment with Prezerv or in the case of Garofalo, his consultancy with Prezerv, and are not permitted to use or disclose this information for their own benefit, or for the benefit of any third party.

36

133.    Defendants misappropriated the confidential and proprietary information they received from or had access to while employed or engaged by Prezerv by taking it from Prezerv without Prezerv's consent or authorization.

134.    Defendants have used Prezerv's confidential proprietary information for their benefit, or for the benefit of another party, without Prezerv's consent or authorization and in a manner that will cause irreparable harm to Prezerv.

135.    By reason of their wrongful conduct, Defendants have misappropriated the confidential and proprietary information they received from Prezerv in violation of the common law.

136.    Prezerv is informed and believes, and thereupon alleges, that Defendants acted willfully and maliciously.

## COUNT V

### Breach of Contract – Confidentiality Agreements

### (Morari, Domeniconi, and Garofalo)

137.    The allegations of the preceding paragraphs are hereby incorporated by reference as though fully set forth herein at length.

138.    Defendants Morari, Domeniconi, and Garofalo entered into Confidentiality Agreements with Prezerv.

139.    The Confidentiality Agreements are enforceable contracts between these Defendants and Prezerv.  Valid consideration was provided in the form of positions with Prezerv, the Stock Agreement, the Stock Option Agreement, Garofalo's consulting agreement, and access to Prezerv's confidential information and trade secrets.

140.    Morari, Domeniconi, and Garofalo materially breached the Confidentiality Agreements as described above and, specifically, by taking, misappropriating, using, and/or disclosing Prezerv's confidential information and trade secrets, failing to return Prezerv's devices and data upon their termination, and/or failing to return Prezerv's devices and data upon demand.

141.    Morari and Domeniconi further breached the Confidentiality Agreements to the extent they employed, solicited, induced, or otherwise influenced Garofalo to join Solidium or otherwise compete with Prezerv.

142.    Prezerv expects to learn of additional breaches of the Confidentiality Agreements during discovery and reserves its rights to recover for any additional breaches.

143.    Defendants' breaches of the Confidentiality Agreements are and is a substantial factor in directly and proximately causing damages and irreparable harm to Prezerv. Prezerv has been and continues to be irreparably harmed by Defendants' actions. Prezerv is therefore entitled to injunctive relief as set forth in §8.1 of the Confidentiality Agreements.

144.    Prezerv is further entitled to repayment of all costs incurred by Prezerv in its efforts to enforce the Confidentiality Agreements and protect its confidential information, including reasonable attorneys' fees, as set forth in §8.1 of the Confidentiality Agreements.

## <u>COUNT VI</u>

### Breach of the Implied Covenant of Good Faith and Fair Dealing

### (Morari, Domeniconi, and Garofalo)

145.    The allegations of the preceding paragraphs are hereby incorporated by reference as though fully set forth herein at length.

146.    The Confidentiality Agreements and Stock Agreement are contracts existing between Prezerv and Defendants Morari, Domeniconi, and Garofalo. Each included an implied covenant of good faith and fair dealing under Massachusetts law.

147.    Defendants Morari, Domeniconi, and Garofalo acted in bad faith and with an improper motive as described herein, in breach of that implied covenant.

148.    The actions of Defendants Morari, Domeniconi, and Garofalo violate the reasonable and justifiable expectations of Prezerv under the terms of those agreements and have the effect of injuring Prezerv's rights to receive the fruits of those agreements.

149.    Defendants' breaches have been and continue to be a substantial factor in directly and proximately causing damages and irreparable harm to Prezerv.  Prezerv has been and continues to be irreparably harmed by Defendants' actions.

## COUNT VII

### Breach of Fiduciary Duty

### (Morari)

150.    The allegations of the preceding paragraphs are hereby incorporated by reference as though fully set forth herein at length.

151.    Defendant Morari occupied positions of trust and confidence at Prezerv and were required to protect Prezerv's interests.  Morari owed a fiduciary duty to Prezerv, including, among other things, a duty of loyalty and duty of care.

152.    Notwithstanding these duties, Morari willfully and intentionally breached his fiduciary duties by destroying, taking, misappropriating, and using Prezerv's confidential information and trade secrets without Prezerv's consent or authorization.

153.    Defendant Morari's breaches have been and continue to be a substantial factor in directly and proximately causing damages and irreparable harm to Prezerv.  Prezerv has been and continues to be irreparably harmed by Defendant Morari's actions.

## COUNT VIII

### Conversion

### (All Defendants)

154.    The allegations of the preceding paragraphs are hereby incorporated by reference as though fully set forth herein at length.

155.    Defendants wrongfully exercised dominion and control over Prezerv's property, confidential information, and trade secrets by failing to return the same and by converting the same for their own use without legal justification, authorization, or privilege.

156.    Defendants' conversion has been and continues to be a substantial factor in directly and proximately causing damages and irreparable harm to Prezerv.  Prezerv has been and continues to be irreparably harmed by Defendants' actions.

**COUNT IX**

**Tortious Interference with Advantageous Business Relations**

**(All Defendants)**

157.    The allegations of the preceding paragraphs are hereby incorporated by reference as though fully set forth herein at length.

158.    The Defendants knew or should have known that Prezerv had an advantageous business relationship with Autostrade.

159.    By the improper means of misappropriating Prezerv's confidential information and trade secrets, as well as deleting or otherwise destroying Prezerv's data and code, Defendants have interfered with Prezerv's relationship with Autostrade.

160.    Prezerv has suffered damages as a result of Defendants' interference with Prezerv's relationship with Autostrade, including but not limited to reputational harm and increased costs and delays arising from Defendants' destruction of Prezerv's data and code.

161.    Defendants' tortious interference has been and continues to be a substantial factor in directly and proximately causing damages and irreparable harm to Prezerv.  Prezerv has been and continues to be irreparably harmed by Defendants' actions.

**COUNT X**

**Unjust Enrichment**

**(All Defendants)**

162.    The allegations of the preceding paragraphs are hereby incorporated by reference as though fully set forth herein at length.

163.    By virtue of their theft of Prezerv's confidential information and trade secrets, Defendants have received a benefit.

164.    Defendants have profited from their possession of Prezerv's confidential information and trade secrets by using that information for their own pecuniary benefit, including using that information to further the interests and efforts of their own competing company, Solidium.

165.    As a result of their actions, Defendants have been unjustly enriched to the detriment of Prezerv.

166.    Defendants' actions have been and continue to be a substantial factor in directly and proximately causing damages and irreparable harm to Prezerv.  Prezerv has been and continues to be irreparably harmed by Defendants' actions.

**COUNT XI**

**Breach of Contract – Stock Agreement**

**(Morari)**

167.    The allegations of the preceding paragraphs are hereby incorporated by reference as though fully set forth herein at length.

168.    Defendant Morari entered into a Stock Agreement with Prezerv.

169.    The Stock Agreement is an enforceable contract between Morari and Prezerv.

170.    Morari materially breached the Stock Agreement as described above and, specifically, by destroying, taking, misappropriating, using, and/or disclosing Prezerv's confidential information and trade secrets, failing to return Prezerv's property such as data, software code and laptops upon his termination, and failing to return Prezerv's property upon demand.  Morari further breached the Stock Agreement to the extent he employed, solicited, induced, or otherwise influenced Garofalo to join Solidium or otherwise compete with Prezerv.  These acts constituted "Misconduct" as defined in the Stock Agreement.

171.    Prezerv expects to learn of additional breaches of the Stock Agreement during discovery and reserves its rights to recover for any additional breaches.

172.    Morari's "Misconduct" constituted a breach of the Stock Agreement and is a substantial factor in directly and proximately causing damages and irreparable harm to Prezerv.  Prezerv has been and continues to be irreparably harmed by Morari's actions.

173.    Pursuant to the Stock Agreement, and due to his "Misconduct," Morari has forfeited all shares in Prezerv he would otherwise have claim to, including those already vested.

## COUNT XII

### Civil Conspiracy

### (All Defendants)

174.    The allegations of the preceding paragraphs are hereby incorporated by reference as though fully set forth herein at length.

175.    Defendants knowingly participated in a tortious plan and concerted action to misappropriate and destroy Prezerv's confidential information and trade secrets, including its data, code, and business plans, as well as to interfere with Prezerv's advantageous business relations and breach the numerous duties and contractual terms referenced above.

176.    Defendants' actions have been and continue to be a substantial factor in directly and proximately causing damages and irreparable harm to Prezerv.  Prezerv has been and continues to be irreparably harmed by Defendants' actions.

## COUNT XIII

### Violation of MGL ch. 93A § 11

### (All Defendants)

177.    The allegations of the preceding paragraphs are hereby incorporated by reference as though fully set forth herein at length.

178.    Prezerv is a "person" and engages in "trade or commerce" within the meaning of Mass. Gen. Laws ch. 93A §1.

179.    Defendants are "persons" and engage in "trade or commerce" within the meaning of Mass. Gen. Laws ch. 93A §1.

180.    The acts at issue primarily and substantially took place in the Commonwealth of Massachusetts, both because Prezerv operates its principal place of business in Massachusetts and because Morari was a resident of Massachusetts for a portion of the relevant time frame.

181.    The actions of Defendants as set forth above constitute willful and knowing violations of Mass. Gen. Laws ch. 93A §11.  Their wrongful practices include, without limitation, the following:

      a.  Misappropriating Prezerv's confidential information and trade secrets for the purpose of their own competing business;

      b.  Deleting or otherwise destroying Prezerv's confidential information and trade secrets, including but not limited to code and data stored in Prezerv's Google cloud servers, GitHub repository, Slack platform, and laptops; and

      c.  Tortiously interfering with Prezerv's advantageous business relationships with its current and prospective clients and investors.

182.    Defendants' violations of ch. 93A have been and continue to be a substantial factor in directly and proximately causing damages and irreparable harm to Prezerv.  Prezerv has been and continues to be irreparably harmed by Defendants' actions.  Because Defendants' violations have been willful and knowing, Prezerv is entitled to treble damages.

## COUNT XIV

### Declaratory Judgment

### (Morari)

183.    The allegations of the preceding paragraphs are hereby incorporated by reference as though fully set forth herein at length.

184.    An actual controversy has arisen between Prezerv and Morari concerning his misconduct and vested shares of Prezerv.  Prezerv asserts that Morari's actions, detailed above, constitute misconduct resulting in the forfeiture of all ownership or interest he may have in any shares of Prezerv.  Morari contests or otherwise ignores Prezerv's position.

185.    Declaratory relief will clarify the rights, obligations, and status of the parties, and is, therefore, appropriate to resolve this controversy.

## COUNT XV

### Breach of Contract – Confidentiality Agreements

### (Morari, Domeniconi, and Garofalo)

186.    The allegations of the preceding paragraphs are hereby incorporated by reference as though fully set forth herein at length.

187.    Defendants Morari, Domeniconi, and Garofalo entered into Confidentiality Agreements with Prezerv.

188.    The Confidentiality Agreements are enforceable contracts between these Defendants and Prezerv.

189.    Prezerv is entitled to repayment of all costs incurred by Prezerv in its efforts to enforce the Confidentiality Agreements and protect its confidential information, including reasonable attorneys' fees, as set forth in §8.1 of the Confidentiality Agreements.

190.    Morari, Domeniconi, and Garofalo materially breached the Confidentiality Agreements as described above and, specifically, when refusing to pay the costs incurred by Prezerv from Prezerv's efforts in enforcing the provisions of the Confidentiality Agreements.

191.    Prezerv has, as of the date below, already incurred over $100,000.00 in costs related to its enforcement of the provisions in the Confidentiality Agreements.  Prezerv expects this number to increase as litigation continues.

### REQUESTS FOR RELIEF

WHEREFORE, Prezerv requests that this Court award the following relief:

A.  Enter judgment in favor of Prezerv on all Counts in the present Complaint;

B.  Award damages to Prezerv in an amount to be determined at trial;

C.  Award double and/or treble damages to Prezerv where permitted by statute;

D.  Award Prezerv its costs, interest, and attorneys' fees as permitted by the Confidentiality Agreements or otherwise;

E.  Issue an immediate order requiring Defendants to preserve all electronic evidence related to the allegations above;

F.  Issue an immediate order requiring Defendants to cease any and all use of Prezerv's confidential information and trade secrets;

G.  Issue an immediate order requiring Defendants to tender to Prezerv copies of all confidential information and trade secrets, including but not limited to data, code, and business plans taken or copied from GitHub, Slack, Google, Prezerv's laptops, or otherwise;

H.  Issue an immediate order requiring Defendants to destroy all data, code, and business plans derived from Prezerv's confidential information and/or trade secrets;

I.  Issue an order finding Defendant Morari to have engaged in "Misconduct" for purposes of confirming Defendant Morari has all forfeited all shares of Prezerv stock under the Stock Agreement;

J.  Award such other further relief as the Court deems necessary and appropriate.

## **JURY DEMAND**

Prezerv demands a jury trial on all claims so triable.


Dated: January 3, 2022

## **VERIFICATION**

I, Cambiz Nick Raufi, hereby swear under the pains and penalties of perjury that, to the best of my knowledge and understanding, part of which is reliant upon information provided by others that I believe to be true, all of the foregoing is true and accurate.

1,3, 2022

Date

Cambiz "Cam" Nick Raufi

Respectfully submitted,

PREZERV TECHNOLOGIES, INC.

By its attorneys,

/s/ William F. McGonigle_____

Raymond P. Ausrotas, Esq. (BBO #640315)
RAusrotas@arrowoodllp.com
William F. McGonigle, Esq. (BBO #569490)
wmcgonigle@arrowoodllp.com
ARROWOOD LLP
10 Post Office Square,
7th Floor South
Boston, MA 02109
T: 617-849-6200

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) or sent by first-class mail to any persons presently indicated as non-registered participants on this date.

/s/ William F. McGonigle